June 7, 1977

## 77-34 MEMORANDUM OPINION FOR THE GENERAL COUNSEL OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

### Reprogramming—Legislative Committee Objection

This is in response to your request for our opinion on two questions arising out of the administration of the Agency for International Development (AID). The first is whether the legislative history of a provision in Title I of the Foreign Assistance and Related Programs Appropriations Act, 1977, Pub. L. No. 94-441, 90 Stat. 1467, can be read to convert that provision into more than a report-and-wait provision. We believe that the legislative history of the provision cannot be so read, and it is our opinion that the executive branch is in no sense legally bound to abide by an objection of the appropriations committees of Congress with regard to a specific reprogramming.

The second question concerns the extent to which the Administrator of your agency might be able to bind the agency, the State Department, or the President not to go forward with reprogramming action over the objection of these congressional bodies. We think that the Administrator may give his or her personal assurance to Congress, orally or in writing, of his intention to give the greatest weight to such an objection, and that he may also convey, if authorized to do so, similar assurances by the Secretary of State and the President. But the Administrator may not legally bind himself, his agency, the Secretary of State, or the President to honor the objection, because such an agreement would constitute formal acceptance by the executive branch of a legislative veto that is constitutionally suspect.

### I. The Effect of the Provision

Under the provision in question, your agency may not reprogram funds for fiscal year 1977 "unless the Appropriations Committees of both Houses of the Congress are previously notified fifteen days in advance." Thus, the provision constitutes a so-called "report and wait" provision of the type that we regard as constitutionally permissible. However, the conference report that deals with this provision discusses

the fact that the provision represents a compromise between the House and Senate managers of the bill, the latter having brought into conference a Senate-passed bill that purported to prevent reprogramming of AID funds without affirmative approval by the appropriations committees of the two Houses. The report states that the compromise "is based on the firm expectation of the conferees that the Executive Branch will follow the historical pattern of honoring objections" to reprogrammings. H.R. Rep. No. 1642, 94th Cong., 2d Sess. 8 (1976). The conference report was approved by both Houses. 122 Cong. Rec. H 11142 (daily ed. Sept. 27, 1976); 122 Cong. Rec. S 16811 (daily ed. Sept. 28, 1976). The question is whether the quoted language, taken together with the language in Title I quoted above, binds your agency or the executive branch to abide by committee "vetoes" of reprogramming decisions as a statutory matter. We think it plain that it does not.

Whatever the "firm expectations" of the conferees might have been in reaching this compromise, their expectations cannot be read as if the Senate version had been enacted into law. As Mr. Justice White recently wrote for the Supreme Court, "legislative intention, without more, is not legislation." *Train* v. *City of New York,* 420 U.S. 35, 45 (1975). Thus, even if we were to read into the conference report an intent to bind the executive branch to follow its historical practice, we would nevertheless conclude that the legislation enacted was inadequate to fulfill that purpose.

II.   Express Agreements Binding the Executive Branch to Abide by Congressional Directives

We think that an express agreement purporting to bind the Administrator to follow the dictates of congressional committees presents both statutory and constitutional issues. In assessing the validity of such an agreement, we would first characterize it as one in which the Administrator places his actual decisionmaking authority concerning specific reprogramming in the congressional body. Thus, while the Administrator exercises some discretion in what reprogramming proposals are to be submitted to the cognizant committee, the latter body would exercise the final decisionmaking authority by virtue of the veto power it would have under the agreement.

A. The Statutory Question

As a statutory matter, therefore, the question is whether the Administrator possesses the authority to delegate his decisionmaking power to a congressional body. The Administrator's own power over reprogramming decisions derives from § 101 of Executive Order 10973, 3 CFR 493 (1959–1963 Compilation), by which the President delegated to the Secretary of State the functions assigned to the President under the Foreign Assistance Act of 1961, 75 Stat. 424, 22 U.S.C. §§ 2151 *et seq.* In that order the President directed the Secretary of State to establish AID, which the latter did by Public Notice 199, 26 Fed. Reg. 10608. In

§ 2(a)(1) of the notice, the Secretary of State specifically delegated to the Administrator his § 101 powers. Nothing in the notice would purport to give the Administrator the authority to delegate beyond himself, much less to a congressional body, his discretion to administer the provisions of the Foreign Assistance Act involved here.

Thus, as a threshhold matter the Administrator does not possess the power to make the kind of delegation of authority contemplated by the proposed agreement. More importantly, we think that if either the order or the public notice attempted to confer such power upon either the Secretary of State or the Administrator, respectively, those documents would be contrary to § 621(a) of the Foreign Assistance Act of 1961, as amended, 22 U.S.C. § 2381(a), which states that the "President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct." We believe that § 2381(a) effectively prohibits delegation of reprogramming decisions to any person outside the executive branch, including congressional bodies or individual Members of Congress.

We end our discussion of this question by pointing out that, under our analysis in Part I, *supra*, of the Appropriations Act, nothing in that Act could be said to qualify the express language of § 2381. We therefore conclude that the Administrator has no power to make the proposed delegation and that any delegation of such power by him would violate § 2381(a).

B. The Constitutional Question

Although our resolution of the statutory question makes it unnecessary to examine the constitutional issue, we briefly address the latter because we think the answer is reasonably well established. As a practical matter, an agreement purporting to bind the Administrator to follow the dictates of a congressional body, if assumed to be binding, would constitute nothing less than a formal committee veto provision. Such provisions have been considered unconstitutional by former Presidents. *See, e.g., Public Papers of the Presidents: Dwight D. Eisenhower,* 1955, at 688-89; *John F. Kennedy,* 1963, at 6. They have also been declared to be unconstitutional by two former Attorneys General. *See* 37 Op. A.G. 56 (1933); 41 Op. A.G. 230 (1955). The fact that here the Administrator would be a party to the agreement, constitutionally, does nothing to remove the taint.

The Administrator cannot delegate his executive power with respect to reprogramming decisions to the chairman of a congressional committee. To do so would be to delegate an executive function to the legislative branch in violation of the doctrine of separation of powers.

III. Express Agreements Binding the Executive Branch to Consult with Congressional Bodies

Given our view that the Administrator lacks statutory and constitutional authority to enter into an agreement effectively surrendering his

135

decisionmaking authority to a congressional body, the question remains as to what type of agreement the Administrator may enter into and the extent to which he would bind himself and his agency by doing so.

We believe that the Administrator may enter into an express agreement by which he would consult with a congressional body prior to making a reprogramming effective and agree to give great deference to the views of that body in reaching a final decision. The crucial point is that the Administrator must retain at all times the authority to make the final decision.

We also think that such a commitment on the part of the Administrator could be made binding on AID if published in the Federal Register. *See* 44 U.S.C. § 1510. A somewhat analogous situation was presented by the action of Acting Attorney General Bork regarding the authority of the Watergate Special Prosecutor to contest an assertion of executive privilege. This commitment was published as a regulation and was said by the Supreme Court to have "the force of law" so long as it was extant. *See, United States* v. *Nixon,* 418 U.S. 683, 695 (1974).

We also believe that such an agreement, whether or not published as a regulation, could be revoked at will by the Administrator or his successor. As the Court said of the regulation involved in the *Nixon* case, "it is theoretically possible for the Attorney General to amend or revoke the regulation. . . ." *Id.* at 696. Once revoked, the agreement would have no further effect.

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

136